**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **KAREN SUE SULLIVAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-CV-04460-BH** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Consent Case** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

By order filed January 15, 2013, this matter has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgement*, filed March 24, 2013 (doc. 28), and *Defendant's Motion for Summary Judgment*, filed May 1, 2013 (doc. 32).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED in part,** Defendant's motion is **DENIED,** and the case is **REMANDED** to the Commissioner for further proceedings.

## I.  BACKGROUND[1]

### A.    <u>Procedural History</u>

Karen Sue Sullivan (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  (R. at 1–3.) On June 29, 2006, Plaintiff applied for DBI and SSI, alleging disability beginning on August 31, 2005, due to osteoarthritis, the inability to sit or stand for long, numbness in her hands and arms,

---

[1]   The background information is summarized from the record of the administrative proceedings, which is designated as "R."

poor eyesight, back pain, depression, muscle spasms and cramping, nerve damage, and stiff neck. (R. at 173, 189, 209.) Her applications were denied initially and upon reconsideration. (R. at 76–78, 89–96, 98–103.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing held on October 23, 2008. (R. at 9–71.) On November 26, 2008, the ALJ issued his decision finding Plaintiff not disabled. (R. at 79–88.) Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on May 1, 2009, making the ALJ's decision the final decision of the Commissioner. (R. at 1–3.) She appealed the Commissioner's decision in federal court pursuant to 42 U.S.C. § 405(g), and on February 8, 2010, the court remanded the case for further proceedings.[2] (R. at 489–91.)

On remand, the same ALJ held another hearing on November 17, 2010. (R. at 394–517.) On January 13, 2011, the ALJ issued his decision finding Plaintiff not disabled. (R. at 502–13.) The Appeals Council again denied Plaintiff's request for review on September 8, 2012, making the ALJ's decision the final decision of the Commissioner. (R. at 518–20.) Plaintiff now appeals the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (doc. 1.)

**B.**    <u>**Factual History**</u>

**1.**    **Age, Education, and Work Experience**

Plaintiff was born on November 20, 1956; she was 53 years old at the time of the second hearing before the ALJ. (R. at 398.) She has a general equivalency degree (GED), and past relevant work as a retail marker, a landscaping nursery manager, and a nursery and horticulture salesperson. (R. at 399, 470–74.)

---

[2] The Commissioner also requested a remand on grounds that reconsideration of Plaintiff's past relevant work was necessary. (R. at 492–93.)

## 2.    Medical Evidence[2]

Plaintiff visited Kaufman Community Health Center (Health Center) on June 20, 2006, for a consultation with Brad White, M.D., her family medicine physician.  (R. at 340.)  Dr. White diagnosed her with herpes II, osteoarthritis, and chronic bronchitis, and he prescribed her medication and ordered laboratory testing.  (*Id.*)

On September 6, 2006, Plaintiff saw Mohiudin A. Zeb, M.D., an internal medicine specialist and consultative examiner for disability determination services, for a consultative examination.  (R. at 242–43.) Dr. Zeb noted that Plaintiff had no history of high blood pressure or diabetes mellitus. (R. at 242.)  Plaintiff told him that she had high cholesterol and was taking medication. (*Id.*)  His initial assessments were back pain, history of lipid disorder, history of depression, and history of bronchitis.  (*Id.*)  Upon a physical examination, he observed that she walked with a normal gait, could walk on her toes and in tandem, had difficulty walking on her heel and squatting, was unable to hop, and did not use assistive devices.  (*Id.*)  Her grip was normal and she could "reach, handle, and feel okay."  (*Id.*)  Dr. Zeb noted that she could sit for 20 minutes, stand for 20 minutes, "move about," lift and carry about 5 pounds, handle objects, and "hear and speak okay."  (*Id.*) X-rays of her lumbar spine taken that day revealed moderate loss of disk height at L5-S1, consistent with degenerative disk disease, but was "otherwise normal."  (R. at 241.)

Plaintiff returned to Health Center on September 14, 2006, and reported feeling better with her medication, but continued having weakness in her legs and insomnia.  (R. at 380.)  Dr. White noted her history of chronic obstructive pulmonary disease (COPD), high cholesterol, depression and coronary artery disease (CAD), and he continued her medications.  (*Id.*)

---

[2]  Because the resolution of this case involves Plaintiff's physical impairments, only the medical evidence is included in this summary.

On October 26, 2006, Yvonne Post, D.O., a state agency medical consultant (SAMC), reviewed Plaintiff's medical records and completed a consultative physical residual functional capacity (RFC) assessment.  (R. at 265–72.)  She listed Plaintiff's primary diagnosis as back pain and her secondary diagnosis as hypercholesterolemia.  (R. at 265.)  She determined that Plaintiff had the following physical RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight with hand and foot controls; and no postural, manipulative, visual, communicative, or environmental limitations.  (R. at 266–69.)  Dr. Post noted that Plaintiff had not received any treatment for her alleged back impairment.  (R. at 272.)  She also referenced Dr. Zeb's consultative findings from the previous month.  (*Id.*)  Dr. Post's assessment was reviewed and fully affirmed a few months later by John Durfor, M.D., another SAMC.  (R. at 273.)

On October 31, 2006, Plaintiff's "chief complaint" was her lower back and neck pain.  (R. at 378–79.)  She told Dr. White that she also experienced "cramping" in her legs that caused her difficulty moving and walking.  (R. at 378.)  Her pain started in her mid and lower neck and radiated down her buttocks, arms, and legs.  (*Id.*)  She rated her pain at 10 on a 10-point scale and described it as "sharp, burning, and stabbing."  (*Id.*)  Activity worsened her pain and "resting" eased it.  (*Id.*)  Dr. White diagnosed her with COPD, mixed hyperlipidemia, sprain of neck, and sprain of the lumbar region, and he prescribed her medication and ordered X-rays.  (R. at 378–79.)  Plaintiff saw Dr. White again the next day and complained of fatigue, weakness in her legs while walking, insomnia, cough, and anxiety.  (R. at 381.)

The following month, another physician at Health Center diagnosed her with cervical and thoracic paraspinal spasm.  (R. at 339.)

On November 14, 2006, Dr. White examined Plaintiff's spine and found that she had normal lumbar lordosis, no spasm or tenderness, and a full range of motion "without limitation or restriction." (R. at 375–76.) Straight leg raises were negative, and she showed no "Hoover" signs of leg paresis. (*Id.*) He diagnosed her with depressive disorder, unspecified idiopathic peripheral neuropathy, COPD, muscle spasm, myalgia and myositis, and he continued her medications. (R. at 375–76.)

By December 1, 2006, Plaintiff was complaining of leg cramps. (R. at 371.) She told Dr. White that she "bent over" the day before and was "barely . . . able to stand back up." (*Id.*) Her lower back was "hurting real bad", and the pain radiated down to her legs and hips. (*Id.*) Upon examination, Dr. White found that she had sinus pain and pressure, nasal obstruction and congestion, and a cough. (R. at 371–72.) She had "tenderness to palpation of the lumbar spine," "evidence of paraspinal muscle spasm," and "decreased" sensation to touch. (R. at 372.) Dr. White ordered a magnetic resonance imaging (MRI) of her lower spine. (R. at 373.)

A few days later, Plaintiff returned to Health Center complaining of fatigue, headaches, hoarseness in her throat, sinusitis, nasal discharge and obstruction, and nasal congestion. (R. at 287.) Among other things, Dr. White diagnosed her with "chronic airway obstruction." (R. at 288.) Throughout January 2007, Plaintiff's chronic airway obstruction was a recurrent condition, and Dr. White noted prescribed her Advair to control her symptoms. (R. at 278, 302–03.) On April 4, 2007, Plaintiff's complaints to Dr. White included fatigue, lethargy, constant pain, and a chronic cough. (R. at 317, 360.) Dr. White referred her to a neurologist. (R. at 360.) Three months later, she complained of dizziness, stomach pain, chronic cough, and numbness and paresthesias in her hands and feet, and stated that she'd had no improvement since her last visit. (R. at 313–14.)

On September 13, 2007, Plaintiff complained of dizziness, pelvic pain, and nasal congestion. (R. at 308.)  Upon a physical examination, Dr. White found that her heart rate was normal, but her heart rhythm was "irregular" with a "murmur."  (*Id.*)  Although her breathing was effortless and normal, her breathing sounds "were diminished bilaterally."  (*Id.*)

Plaintiff presented to Albert Lea Medical Center/Mayo Health System (Mayo Clinic) for the first time on September 2, 2009, "to establish new provider care" after she moved from Texas to Minnesota.  (R. at 632–33, 649.)  On November 22, 2009, she was taken by ambulance to the emergency room at Mayo Clinic because she was experiencing severe chest pain.  (R. at 632, 669.) She reported "tightness and squeezing across [her] upper chest," nausea and "mild vomiting," nasal congestion, and "difficulty breathing."  (R. at 626.)  X-rays showed "equivocal findings," and the radiologist noted that "a small subtle infiltrate" in her right lung could "not be ruled out."  (R. at 669.)  Steven K. Wiese, M.D., the attending physician, diagnosed her with atypical chest pain and acute bronchitis, prescribed medication, and discharged her in a stable condition.  (R. at 627–28.)

Plaintiff returned to the Mayo Clinic on December 16, 2009, with allegations of numbness and pain in her feet and legs.  (R. at 621.)  She told Duard Birkhofer, M.D., a Mayo Clinic physician, that her symptoms had worsened over the past two or three years.  (*Id.*)  He opined that she had a "high risk for chronic peripheral neuropathy" due to her long smoking history and referred her to a neurologist.  (*Id.*)  He also advised her to stop smoking and gave her information about an assistance program.  (*Id.*)  A few days later, Nathan Young, M.D., a specialist in neurology, opined that the cause of Plaintiff's pain and numbness in her extremities was "probably small fiber peripheral neuropathy with polypharmacy, Parkinsonism, and anxiety/depression."  (R. at 617.)

By February 24, 2010, Plaintiff's "chronic pain syndrome" was not improving.  (R. at 613–14.)  She told a Mayo Clinic physician that she felt pain, "muscle tightness," "cramping," and weakness "all over."  (R. at 613.)  She saw Eun Jong Kim, another neurologist, on March 2, 2010, for further evaluation.  (R. at 599–602.)  Dr. Kim's differential diagnoses included chronic pain, muscle spasms, peripheral neuropathy (not otherwise specified), and skin sensation disturbance.  (R. at 599.)  An electromyography (EMG) revealed "no abnormal spontaneous activity" in her muscles and "no electrophysiologic evidence" of neuropathy.  (R. at 589.)  Dr. Kim did note "electrophysiologic evidence of [] mild focal median neuropathy" in her left wrist and prescribed her a "night splint."  (*Id.*)  Two months later, Jason H. Szostek, M.D., a specialist in internal medicine, reviewed Plaintiff's EMG and conducted a MRI.  (R. at 679.)  His "final diagnoses" were elevated hemoglobin, "probable sensory neuropathy," and "possible cerebellar atrophy." (R. at 672.)

Dr. Birkhofer examined Plaintiff on June 28, 2010, because she was again experiencing chest discomfort.  (R. at 954.)  He noted her history of COPD and listed her "current problems" as chest pain, hyperlipidemia, nicotine dependence, and hypertension.  (R. at 960.)  On September 3, 2010, Plaintiff presented to the Mayo Clinic for a consultation regarding pain in her right shoulder.  (R. at 947.)  She told Dr. Birkhofer that she had injured her shoulder during a fall the previous month, but she did not seek medical attention because she did not have health insurance.  (*Id.*) Dr. Birkhofer found that she had tenderness in her right shoulder and deltoid and a fairly good range of motion, "but at about 80 degrees [her shoulder] start[ed] to lock up."  (*Id.*)  He diagnosed her with possible rotator cuff or deltoid strain and discussed the possibility of physical therapy.  (*Id.*)  Two weeks later, her shoulder continued to be painful with movement and lifting.  (R. at 935.)

On October 27, 2010, Mark Ciota, M.D., found that an MRI of Plaintiff's right shoulder

showed no rotator cuff tearing, but did reveal "some tendinosis." (R. at 907.) Dr. Ciota prescribed her medication and referred her to physical therapy three times a week for six weeks. (R. at 907, 1528.) She presented for physical therapy on December 3, 2010. (R. at 1524–25.) She told Renee Ruble, the physical therapist, that she had constant pain in her right shoulder, which was her "dominant arm," and rated her pain at 5 on a 10-point scale. (R. at 1524.) She had difficulty completing her daily living activities, such as dressing and grooming, because movement exacerbated her pain. (*Id.*) She later told another therapist that she experienced relief from her pain after her therapy sessions, but it did "not last for very long." (R. at 1523.) The therapist noted that she was unable to perform even 3 repetitions of a given exercise because it "was too painful." (*Id.*) During a follow up consultation with Dr. Ciota on December 20, 2010, Plaintiff complained that her pain was not "getting any better." (R. at 890.) Dr. Ciota opined that Plaintiff showed "impingement-type" symptoms in her right shoulder, administered a steroid injection, and discussed other treatment options, including surgery. (*Id.*) On January 28, 2011, Plaintiff stopped attending physical therapy due to "transportation issues." (R. at 1522.) The therapist noted her goals were only "partially met" and her pain had not decreased "enough to allow improved ease with her daily tasks." (*Id.*)

### 3. Hearing Testimony

On November 17, 2010, Plaintiff, a psychological expert (PE), a medical expert (ME), and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 394–488.) Plaintiff was represented by an attorney. (R. at 394.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she lived in Minnesota, was 53 years old, was separated, and had one child under 18. (R. at 398.) She did not complete high school but had a GED. (R. at 399.) She was

5 feet 7 inches tall, weighed 175 pounds, and was right-handed.   (*Id.*)

Plaintiff last worked in September 2005 making heater components at a manufacturing plant in Terrell, Texas.  (R. at 400.)  She worked there for only two weeks because that was all she "could handle."  (*Id.*)  Before that, she worked for "Commercial Conversions" placing barcodes on store shelves.  (R. at 400–01.)  At some point, she also worked for a company connecting "DSL services to different businesses."  (R. at 402.)  From October 2004 to February 2005, she worked "doing wiring," and before that, she worked for a landscaping company watering plants and loading/ unloading trucks. (R. at 402–03.)  The most she lifted at the landscaping job was 15 pounds.  (R. at 403.)  From 1993 to 1994, she "worked in quality control in manufacturing."  (R. at 407.)

Plaintiff stopped working in 2005 because she had carpal tunnel syndrome and just "couldn't continue" doing the job.  (R. at 409.)  She experienced numbing and tingling in her fingers, feet, toes, and legs as a result of her neuropathy.  (R. at 411.)  She was diagnosed and treated for depression, but was later diagnosed with bipolar disorder.  (R. at 412.)  She took medications for her neuropathy, muscle spasms, and bipolar disorder.  (R. at 413–14.)

Plaintiff had "problems with walking"; when she "walk[ed] a certain distance, [her] legs [] cramp[ed] up."  (*Id.*)  She could not even walk one city block due to the leg cramps.  (R. at 416.)  Her doctors told her that her leg cramps were caused by her "bad circulation" and neuropathy.  (*Id.*)  On a typical day, she did not "really do much of anything" and spent "a lot of time lying in bed."  (*Id.*)  She could bathe and dress herself.  (*Id.*)  If she sat for more than 20 minutes, she "started getting numb and tingly" from her "hips down."  (*Id.*)  She could stand for only 15 minutes at a time and lift about a gallon of milk.  (R. at 418–19.)

Plaintiff saw her doctors at the Mayo Clinic at least once a week and saw her psychologist once a month.  (R. at 421.)  One doctor diagnosed her with chronic fibromyalgia.  (R. at 424.)  Her neuropathy caused her numbness, tingling, stabbing pain, and a feeling of "ice picks" that made it difficult for her to feel objects with her hands.  (R. at 425.)  She developed carpal tunnel syndrome in her right wrist from working at an assembly line and underwent corrective surgery.  (R. at 426.)

Plaintiff ate out "once every two months."  (R. at 427.)  She did not attend church or any other type of "social gatherings."  (R. at 428.)  She tried helping with the house chores and occasionally washed the dishes.  (*Id.*)  On the days when she felt neither "good" nor "bad," she "[g]ot on the computer," emailed some friends, and "might try to walk to the post office," which was about one city block away from her house.  (R. at 429.)

Plaintiff felt pain all over her body, both in her joints and muscles.  (R. at 431.)  Her osteoarthritis was worse in her knees and fingers.  (R. at 432.)  Her cramps affected all of her body, even her jaw.  (*Id.*)  She had recently fallen and injured her rotator cuff in her right shoulder, and she was "waiting" to undergo "some physical therapy."  (R. at 433.)  She could not even raise her right arm up to her shoulder or reach out in front of her to grab objects and "put them in a box" because it was "extremely painful."  (R. at 433–34.)  She did not have any trouble with her left hand. (R. at 434.)

She started having back pain when she was in her "early 20s" due to a "herniated disk."  (R. at 435.)  A consultative examiner found that she could sit for 20 minutes, stand for 20 minutes, and carry up to 5 pounds.  (*Id.*)  In response to counsel's question, she stated that she could perform a job where she had the option to "alternate" between "sitting and standing" for 6 hours of an 8-hour workday, but she "would always [have to] push [herself]."  (R. at 439–41.)  She could "possibly"

-10-

lift 10 pounds.  (R. at 441.)  She would "most likely" need to take a 15-minute break every hour.  (R. at 441–42.)  She could not work for 8 hours "without having to lie down" "for a few hours" "at some point."  (R. at 442.)[3]

### b.    PE's Testimony

According to the PE, treatment records showed that Plaintiff was first diagnosed with major depression and later with bipolar disorder.  (R. at 452.)  There was also "a mention of anxiety disorder", but he opined that such a diagnosis was "not fully supported" because "the rest of the record [did] not address [it] at all."  (*Id.*)  He opined that Plaintiff's diagnosis of bipolar disorder was correct based on the SAMC's findings on the psychiatric review technique form.  (R. at 454–60.)  In response to counsel's question, he explained that a global assessment of functioning (GAF) score "reflects a subjective judgment of the person's overall functioning at or about the time the doctor observes" the person.  (R. at 465.)  "The GAF does not directly correlate with disability determination," but functions only "as a clinical benchmark."  (*Id.*)  In the PE's view, a GAF score was "not a reliable tool" because research showed that treatment providers "varied greatly" in their assessment methods, and the assessment provides only "a snapshot" of the person.  (R. at 466–67.)

### c.    ME's Testimony

The ME, "a semi-retired internist," testified that X-rays of Plaintiff's lumbar spine showed "considerable narrowing" at the L5-S1 level, but the differential diagnoses of fibromyalgia and neuropathy were never confirmed because an EMG and nerve conduction tests "were negative."  (R. at 444.)  Consequently, her doctors "couldn't really come to a specific conclusion as to the cause of her numbness and tingling"; they only "speculated about what the diagnosis [was]."  (R. at 444,

---

[3] At this point, the ALJ explained that the Appeals Council's reasons for remand was to determine whether Plaintiff's past employment could be considered "past relevant work" and to "update the medical record."  (R. at 436.)

448.)   He explained that neuropathy "is a degeneration of peripheral nerves" and is constant, meaning that "it's not something that comes and goes."  (R. at 445.)  Plaintiff's symptoms were not constant; she testified for example, that she "began" to feel numb after sitting for 20 minutes.  (*Id.*)  The ME opined that Plaintiff had "lumbar spondylosis," and on that basis, he was "willing to give her a full light RFC."  (R. at 446.)

The ME did not adopt Dr. Zeb's consultative findings in September 2006 that Plaintiff could sit for 20 minutes, stand for 20 minutes, and carry 5 pounds because Dr. Zeb did not "document the justification for those restrictions" with objective medical evidence.  (R. at 447.)  Lastly, the ME noted Plaintiff's "peculiar family history [of] Ptosis and odd neurologic things."

> ### d.    VE's Testimony

The VE classified Plaintiff's past relevant work as a landscaping nursery manager (light, skilled, SVP-8) and horticulture sales person (light, semi-skilled, SVP-4).  (R. at 470–80.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform her past relevant work if she had the following RFC: perform full light work; understand and do simple, "but not complex or detailed" tasks; and have "no problem working with [the] public, coworkers, or supervisors."  (R. at 480.)  The VE initially opined that the person could perform Plaintiff's past relevant work as a "retail marker," but upon further inquiry by counsel, he clarified that the retail marker position did not constitute significant gainful activity (SGA) and therefore was not past relevant work.  (R. at 480, 483.)

The ALJ modified the hypothetical to include the following limitations: walk for less than one city block; sit for only 20 minutes at a time; stand for only 15 minutes at a time; and lift no more than a gallon of milk.  (R. at 481.)  The VE opined that the person could not perform any of

Plaintiff's past relevant work or any other job in the national economy.  (*Id.*)  When the ALJ asked the VE to opine whether the first hypothetical person could perform other jobs in the national economy, the VE testified that the person could perform the jobs of ticket seller (light, unskilled, SVP-2), with 90,000 jobs in Texas and 1,000,000 jobs in the national economy; cashier II (light, unskilled, SVP-2), with 90,000 jobs in Texas and 1,000,000 jobs in the national economy; and cafeteria attendant (light, unskilled, SVP-2), with 6,000 jobs in Texas and 71,000 jobs in the national economy.  (R. at 484–85.)

In response to counsel's question, the VE stated that the ticket seller job had a "sit-stand" option, and "sometimes" the cashier job had that option as well.  (R. at 485.)  Since all three jobs listed by the VE were unskilled, there was "no need" for the person in the first hypothetical to have "transferable" skills.  (R. at 486.)  When counsel added the limitations to stand for 20 minutes and sit for 20 minutes, the VE testified that the person would be unable to maintain competitive employment.  (*Id.*)  The requirement to take a 15-minute break every hour to lie down would also preclude competitive employment.  (R. at 487.)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on January 13, 2011.  (R. at 502–13.)  At step one, he found that Plaintiff had not engaged in SGA since her alleged onset date of August 31, 2005.  (R. at 504.)  At step two, he found that Plaintiff had three severe impairments: lumbar spondylosis, carpal tunnel release, and depressive disorder.  (*Id.*) Despite those impairments, at step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in the regulations.  (R. at 505–09.)

Before proceeding to step four, the ALJ determined that Plaintiff had following RFC: perform less than the full range of light work as defined by 20 C.F.R. §§ 404.1567(b), 416.967(b); lift and carry 10 pounds frequently and 20 pounds occasionally; stand, walk, and sit for 6 hours in an 8-hour workday; and do simple, "but not complex or detailed," tasks.  (R. at 509.)  At step four, with the VE's testimony, the ALJ determined that Plaintiff could not perform her past relevant work. (R. at 512.)  At step five, also based on the VE's testimony, the ALJ determined that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as ticket seller, cashier II, and cafeteria attendant.  (R. at 513.)  Accordingly, the ALJ concluded that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between her alleged onset date and the date of the ALJ's decision.  (*Id.*)

## II.     ANALYSIS

### A.     Legal Standards

#### 1.     Standard of Review

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(c)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*,

38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.*  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2.	Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mentla impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.	An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.	An individual who does not have a "severe impairment" will not be found to be disabled.

-15-

3.      An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.      If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greendspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**3.      Standard for Finding of Entitlement to Benefits**

As an alternative to remand, Plaintiff asks the Court to reverse the case "for an immediate award of benefits."  (Pl. Br. at 18.)

If an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that

-16-

the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). Inconsistencies and unresolved issues in the record therefore preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam).

## B.    Issues for Review

Plaintiff presents four issues for review:

(1) The ALJ failed to evaluate the severity of several of [Plaintiff's] medically determinable impairments.;

(2) The ALJ's residual functional capacity determination failed to include all of [Plaintiff's] mental limitations and was not supported by substantial evidence.;

(3) The ALJ failed to include all of [Plaintiff's] physical limitations in the residual functional capacity determination.; [and]

(4) The evidence clearly establishes that [Plaintiff] was, at the very least, limited to performing less than a full range of sedentary work. Thus, the ALJ failed to include all of her limitations in the hypothetical question posed to the vocational expert, and pursuant to the Medical-Vocational Guidelines (Grids), she was disabled as a matter of law beginning on her fiftieth birthday.

(Pl. Br. at 1.)

## C.    *Stone* (De Minimis) Standard

Plaintiff argues that remand is required because the ALJ "did not correctly apply" the *Stone* severity standard "in evaluating the severity of all of [Plaintiff's] medically determinable impairments" at step two. (Pl. Br. at 3.) She claims that if the ALJ had used the *Stone* severity standard, he would have recognized as severe her "peripheral neuropathy, chronic obstructive pulmonary disease, and right shoulder impingement." (*Id.* at 3–4.)

-17-

### 1.    *Stone Error*

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (2012).  The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985).  "Because a determination [of] whether an impairment[] is severe requires an assessment of the functionally limiting effects of an impairment[], [all] symptom-related limitations and restrictions must be considered at this step."  Social Security Ruling (SSR) 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996).  Ultimately, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity."  *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) [(2012)] is used."  *Id*. at 1106; *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  Notwithstanding this presumption, however, courts must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard.  *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, in reciting the applicable law, the ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's

ability to perform basic work activities." (R. at 503) (citing to 20 C.F.R. § 404.1520(c)). He further stated that an impairment or combination of impairment is "not severe" "when medical and other evidence establish only a slight abnormality or combination of slight abnormalities that would have *no more than a minimal effect* on an individual's ability to work." (*Id.*) (citing 20 C.F.R. §§ 404.1521 and 416.921) (emphasis added). The ALJ did not cite *Stone* anywhere in his decision. (*See* R. at 502–13.)

Courts in this district have construed the language of 20 C.F.R. § 404.1521, cited by the ALJ in this case, as "indicat[in]g that the impairment [can] have, 'at most, a minimal effect on a claimant's ability to work." *See, e.g.*, *Middleton v. Colvin*, No. 3:13-CV-2647-BN, 2014 WL 1158894, at *4 (N.D. Tex. Mar. 21, 2014) (citing *Sanders v. Astrue*, No. 3:07–CV–1827–G–BH, 2008 WL 4211146, at *7 (N.D. Tex. Sept.12, 2008)). Notably, these courts have held that "[b]ecause the standard set forth in *Stone* 'provides no allowance for a minimal interference on a claimant's ability to work,'" the language that the ALJ cited in this case is "not a proper recitation of the severity standard." *Id.*; *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb. 6, 2013) ("while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard"); *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805 (N.D. Tex. 2009) ("Unlike the standard applied by the ALJ, *Stone* provides no allowance for a minimal interference on a claimant's ability to work."). The difference between the ALJ's articulations and *Stone*, coupled with the ALJ's failure to cite *Stone* or specify which standard he actually applied, compel the conclusion that he applied an incorrect standard of severity.

Nevertheless, as recently held by the Fifth Circuit and courts within this district, *Stone* error

does not mandate automatic reversal and remand, and application of the harmless error analysis is appropriate in cases where the ALJ proceeds past step two. *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* at step two but proceeded to the remaining steps of the sequential evaluation process); *Goodman v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-1321-G BH, 2012 WL 4473136, at *9 (N.D. Tex. Sept. 10, 2012), *rec. adopted*, 2012 WL 4479253 (N.D. Tex. Sept. 28, 2012) (same); *Jones v. Astrue*, 821 F. Supp. 2d 842, 851 (N.D. Tex. 2011).   In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

###### 2.      Harmless Error

Plaintiff argues, in essence, that the ALJ's *Stone* error was not harmless and requires remand because he failed to find that her "peripheral neuropathy, chronic obstructive pulmonary disease, and right shoulder impingement" were severe impairments at step two and affected her ability to work at other steps of the analysis.   (Pl. Br. at 7–8.)

The ALJ found at step two that Plaintiff had three severe impairments: lumbar spondylosis, carpal tunnel release, and depressive disorder.   (R. at 504.)   He referenced Dr. Post's, an SAMC, notation in her October 26, 2006 consultative RFC assessment that Plaintiff's primary diagnosis was "back pain," as well as her opinion that Plaintiff could perform "light exertional activities" with several limitations.   (R. at 505.)   Notably, the ALJ's step two discussion did not address or even mention Plaintiff's peripheral neuropathy, chronic obstructive pulmonary disease, or right shoulder injury.   (*See* R. at 504–05.)   Finding that none of Plaintiff's impairments or combination of

impairments met or medically equaled a listed impairment at step three, the ALJ proceeded to assess Plaintiff's RFC.  (*See* R. at 505–09); *see also Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.") (citing 20 C.F.R. § 404.1520a(d)(3)).  The ALJ determined that Plaintiff had the following RFC: perform less than the full range of light work; lift and carry 10 pounds frequently and 20 occasionally; stand, walk, and sit for 6 hours in an 8-hour workday; and "do simple [], but not complex or detailed, tasks."  (R. at 509.)

In assessing Plaintiff's RFC, the ALJ was required to consider all "medically determinable impairments," including those that were "not 'severe,'" as well as "all of the relevant medical and other evidence" in the record.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996) ("While a 'not severe' impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").  In his RFC narrative discussion, the ALJ explained that he "considered all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence."  (R. at 509.)  He considered Plaintiff's testimony that she: (1) had "neuropathy" that "caus[ed] numbness and tingling in her fingers, feet, and toes"; (2) took "medicines for neuropathy, muscle spasms, [and] bipolar disorder"; (3) could walk for "less than one block but her legs cramp[ed],"; (4) had poor circulation; (5) could sit for only 20 minutes before feeling numbness and tingling "from her hips because of neuropathy"; (6) was treated for fibromyalgia for 5 years; (7) had osteoarthritis pain; and (8) suffered from back problems since her early 20s "from a herniated disk."  (R. at 509–10.)

The ALJ implicitly adopted the ME's testimony that Plaintiff's physicians at the Mayo Clinic could not find the cause of her pain, stating that there were "no tests showing" that she had the impairment that she alleged.  (R. at 444, 448, 510.)  He explained that testing "ha[d] been negative for subluxation, herniation, spinal stenosis, and nerve root compression."  (R. at 511.)  He did not give much credence to Plaintiff's allegation that her daily living activities were "fairly limited" "in view of the relatively weak medical evidence and other factors."  (*Id.*)  He also explained that Plaintiff had "not generally received the type of medical treatment one would expect for a totally disabled individual."  (*Id.*)  Accordingly, he concluded that in light of the objective medical evidence, Plaintiff's allegations about her impairments and their limitations on her ability to work were "not entirely credible."  (R. at 511.)  Lastly, the ALJ stated that the ME's opinion that Plaintiff had the RFC to perform light work took into account her alleged pain, and he also gave "significant evidentiary weight" to Dr. Post's opinion that Plaintiff had the RFC to perform "light work activities."  (R. at 511.)  The ALJ then proceeded to steps four and five, and based on the VE's testimony, he concluded that considering Plaintiff's age, education, work experience, and RFC, she could not perform her past relevant work but could perform other work.  (R. at 511–13.)

Although the ALJ did not explicitly find Plaintiff's peripheral neuropathy to be a severe impairment at step two, his RFC discussion shows that he considered her testimony regarding this impairment and its resulting limitations.  (*See* R. at 510.)  He acknowledged her statement that her neuropathy caused numbness and tingling in her fingers, feet, and toes.  (*Id.*)  He implicitly adopted the ME's opinion that the neuropathy diagnosis was never confirmed with objective tests because the EMG and nerve conduction tests "were negative."  (*See* R. at 444, 510–11.)  The ALJ's *Stone* error as it relates to this alleged impairment was harmless because it is inconceivable that he would

-22-

have assessed a different physical RFC—and thereby reached a different disability determination at step five—if he had applied the *Stone* severity standard at step two.

Nonetheless, nowhere in his opinion did the ALJ discuss or even mention Plaintiff's COPD.[4] (*See* R. at 509–11.)  Because the ALJ did not address her COPD at any step of the disability analysis, it is unclear whether he purposefully dismissed it as non-severe based on his application of an incorrect severity standard at step two.  Moreover, he did not consider the effects that this impairment may have on Plaintiff's ability to perform work-related functions when assessing her RFC, as he was required to do by the regulations and corresponding ruling.  *See* 20 C.F.R. § 404.1545(a)(1)-(3); SSR 85-28, 1985 WL 56856, at *3.  Consequently, he did not consider the effects that Plaintiff's COPD may have on her ability to work at step five.  From June 20, 2006 to December 16, 2009, Plaintiff repeatedly complained of nasal congestion, breathing difficulties, and cough.  (*See* R. at 288, 313–14, 317, 340, 360, 371–72, 380.)  In January 2007, her "chronic airway obstruction" was an on-going concern, and throughout the medical history, her doctors repeatedly prescribed her Advair to treat her breathing difficulties and other nasal symptoms.  (R. at 278, 302–03, 378, 960.)  If the ALJ had considered this evidence, he might have imposed environmental restrictions in her RFC, such as limiting her exposure to fumes, odors, dusts, gases, and poor ventilation.  It is not inconceivable that if the ALJ had posed this more restrictive hypothetical to the VE, a different determination might have been reached regarding Plaintiff's ability to perform the job of "cafeteria attendant" at step five.  Accordingly, the ALJ's *Stone* error was not harmless

---

[4]   Plaintiff's COPD could reasonably be said to constitute a "medically determinable impairment" because it was "demonstrable by medically acceptable clinical and laboratory techniques," including Dr. White's diagnoses in October and November 2006 and Dr. Birkhofer's diagnosis in June 2010.  (*See* R. at 375–76, 378–79, 960); *see also* 42 U.S.C.A. § 423(d)(3) (West 2004) ("[A] 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.").

as it relates to Plaintiff's COPD.

Moreover, although the ALJ's narrative discussion states that Plaintiff could "raise her right arm up to her shoulder" and "ha[d] no trouble with her left hand" (R. at 510), Plaintiff actually testified that she could *not* raise her right arm up to her shoulder and could *not* extend it out in front of her to "pick up" objects and place them in a box because it was "extremely painful." (*See* R. 433–34.) Given that the ALJ's only mention of Plaintiff's right shoulder injury[5] was incorrect, it cannot be determined whether he considered this alleged impairment at any step of the disability analysis. The evidence before the ALJ showed that on September 3, 2010, Plaintiff told Dr. Birkhofer that she fell and injured her right shoulder the month before. (R. at 947.) Upon a physical examination, Dr. Birkhofer found that she had tenderness in her shoulder and deltoid and her shoulder started to "lock up" at 80 degrees. (*Id.*) The October 27, 2010 MRI revealed "some tendinosis," and Dr. Ciota referred her to physical therapy three times a week for six weeks. (R. at 907, 1528.) Nearly two months later, Dr. Ciota diagnosed her with "impingement-type" symptoms, administered a steroid injection, and discussed more aggressive treatment options. (R. at 890.)

Because the ALJ did not reference this evidence in assessing Plaintiff's RFC, it is unclear whether he accounted for the effects of Plaintiff's right shoulder injury on her ability to perform work-related functions as he was required. *See* 20 C.F.R. § 404.1545(a)(1)-(3); SSR 85-28, 1985 WL 56856, at *3. Consequently, it is unclear whether he considered the effects that this alleged impairment may have her ability to work at step five. Although he limited Plaintiff to "less than the full range of light work," the ALJ might have limited the amount of weight she could lift with her right hand and arm, or might have limited her reaching, handling, or fingering with her right hand

---

[5] Plaintiff's right shoulder injury was arguably "demonstrable by medically acceptable clinical and laboratory diagnostic techniques," such as the MRI that revealed "tendinosis" and Dr. Ciota's diagnosis of "impingement-type" symptoms. (*See* R. at 890; 907); *see also* 42 U.S.C.A. § 423(d)(3).

if he had considered Plaintiff's right shoulder injury.  Had the ALJ posed a hypothetical to the VE with such restrictions, the VE's opinion regarding Plaintiff's ability to perform the jobs of "ticket seller," "cashier II," and "cafeteria attendant" might have been different.

In conclusion, because is not inconceivable that the ALJ would have reached a different determination at step five absent his *Stone* error at step two error, the error was not harmless as it relates to Plaintiff's COPD and right shoulder injury, and it requires remand.  *See Hall v. Astrue*, No. 3:11-CV-1929-BH, 2012 WL 4167637, at *13 (N.D. Tex. Sept. 20, 2012) (holding that *Stone* error was not harmless and required remand where the ALJ failed to consider the effects of the claimant's chronic breathing difficulties on his ability to work at any step of the sequential evaluation process).

The Court does not reach Plaintiff's remaining issues because the ALJ's application of the correct severity standard on remand will likely affect them.[7]

### III.  CONCLUSION

Plaintiff's motion is **GRANTED in part,** Defendant's motion is **DENIED,** and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED** on this 31st day of March, 2014.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[7] Plaintiff has not met her "heavy burden" to prove disability because there are unresolved issues in the record to be determined on remand.  Her request for disability benefits at this stage of the proceedings is therefore denied.